### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| REBECCA P.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 3:20-CV-01054-MAB |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to Title II of the Social Security Act, 42 U.S.C. § 423.[2]

### Procedural History

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits, alleging a disability onset date of November 12, 2016, on March 23, 2018 (Tr. 20). The claim was initially denied on November 30, 2018 and denied again upon reconsideration on June 11, 2019. *Id.* Plaintiff then filed a written request for a hearing, which was received on July 16, 2019. The claim proceeded to a hearing before

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*See* Doc. 8).

Administrative Law Judge ("ALJ") Stephen M. Hanekamp on March 31, 2020. *Id.* The ALJ again denied Plaintiff's application on April 17, 2020 (Tr. 17). The Appeals Council denied Plaintiff's request for review on September 15, 2020, making the ALJ's decision the final agency decision subject to judicial review (Tr. 2-7). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following two issues:

1. The ALJ ignored the VE's testimony regarding the reaching requirements of the job of a cashier; and
2. The ALJ ignored all favorable evidence pertaining to the Plaintiff's mental health.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order. 20 C.F.R. § 416.920(a)(4). The first question is whether the claimant is

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.,* and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.,* and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations.

presently engaged in substantial gainful activity? *Id.* If the answer is yes, then the claimant is not disabled regardless of their medical condition, their age, education, and work experience. *Id.* at § 416.920(a)(4)(i), (b). If the answer is no, and the individual is not engaged in SGA, the analysis proceeds to question two. *Id.* at § 416.920(a)(4).

At question two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months? 20 C.F.R. § 416.920(a)(4)(ii), 416.909. If the answer is no, then the claimant is not disabled. *Id.* at § 416.920(c). If the answer is yes, the analysis proceeds to question three. *Id.* at § 416.920(a)(4).

At question three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 416.920(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1. (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 416.920(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity (RFC). *Id.* at § 416.920(e).

Then at step four, the ALJ must determine whether the claimant retains the RFC to continue performing their former occupation. 20 C.F.R. § 416.920(a)(4)(iv). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(a)(4)(iv), (f). If the answer is no, the analysis proceeds to the fifth and last question, which is whether the claimant can make an adjustment to perform any other work. *Id.* at § 416.920(a)(4)(v). If the answer

is yes, then the claimant is not disabled. *Id.* at § 416.920(g). If the answer is no, the claimant is found disabled. *Id.*

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.   "[W]e will reverse only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (citation and internal quotation marks omitted).

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff did not engage in substantial gainful activity during the period

from her alleged onset date of November 12, 2016 through her date last insured of December 31, 2018 (Tr. 22).

Plaintiff was born on January 11, 1959 and was 57-years old on the alleged disability onset date (Tr. 20). At step two, the ALJ found that Plaintiff had severe impairments of C. diff, irritable bowel syndrome (IBS), obesity, degenerative joint disease of the shoulders, and seizure disorder (Tr. 22). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 CFR 404, Subpart P, Appendix 1 (Tr. 24).

The ALJ found that through the date last insured, Plaintiff had the following RFC:

> The claimant has the residual functional capacity to lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally, sit for a total of 6 hours in an 8-hour workday and walk/stand for a total of 6 hours in an 8-hour workday. She could never climb ladders, ropes, or scaffolds, but could occasionally crawl. She was unlimited in her ability to balance, kneel, crouch, stoop, and climb ramps and stairs. She could not reach overhead with either upper extremity, but could frequently reach in other directions bilaterally. She could not be exposed to dangerous unprotected heights or dangerous unprotected moving machinery.

(Tr. 25).

Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform her past relevant work as a cashier as generally and actually performed. Additionally, the ALJ found that Plaintiff could perform the past relevant work of supervisor or cashier as generally performed, but not actually performed (Tr. 29). Ultimately, the ALJ found Plaintiff was not disabled (Tr. 30).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in preparing

this Memorandum and Order. The following summary of the record is directed to the points and factual allegations raised by Plaintiff.

### 1.    Evidentiary Hearing

Plaintiff was represented by an attorney at the March 31, 2020 hearing. (Tr. 39). At the time of the hearing, Plaintiff was 61-years old (Tr. 42). Plaintiff testified that she is divorced, but at the time of the hearing, had a significant other for 16 years who she also lived with. *Id.* She testified that her last day of work was November 11, 2016 (Tr. 43).

The ALJ questioned Plaintiff about her prior work history. Plaintiff explained that she was a sales associate at Dillard's, as well as "did inventory" and put inventory on the store floor (Tr. 43). The heaviest weight she had to lift at Dillard's was around 10 pounds (Tr. 43-44). She then got a job as a cashier at Home Depot around 2004 after receiving a pay cut at Dillard's (Tr. 44). She moved up to a supervisory role very quickly at Home Depot and, by about 2006, had a team of cashiers she managed (Tr. 45). At Home Depot, Plaintiff testified that the heaviest she lifted was about 20 pounds. *Id.* She also testified that she was on her feet around seven hours every day at this job and "moved all day." *Id.*

Plaintiff testified about her physical problems that impact her ability to work. She explained that starting in 2011, she began to have issues with her left shoulder where she could not move it (Tr. 46). Her doctor said her shoulder was "frozen," and prescribed physical therapy, which Plaintiff testified did not help. *Id.* She then went to an orthopedic surgeon, who gave her a shot that was supposed to help, but her shoulder remained locked. *Id.* She explained that the orthopedic surgeon manipulated the shoulder in March

2012, which provided her with some movement. *Id.* She then went into physical therapy again, but her shoulder continued to hurt so she returned to the orthopedic surgeon (Tr. 46-47). She continued physical therapy and this course of treatment with the orthopedic surgeon (which she described as clearing out bones and moving stuff around) for about nine months (Tr. 47). She returned to work in July, but only as a cashier and not a head cashier. *Id.* In September 2012, her right shoulder started to act up, which she spoke to her physical therapist about and also her orthopedic surgeon. *Id.* The orthopedic surgeon did an MRI, which showed that she had a torn rotator cuff. *Id.* Plaintiff testified that after years of treatment and physical therapy, she is at around 80% for her left shoulder and 60-65% for her right shoulder. *Id.* Additionally, she is right handed (Tr. 47-48).

Plaintiff testified that she saw a social security doctor, Dr. Smiderman, in 2018, who determined that she had a limited range of motion for her right arm, but that her mobility since then has decreased (Tr. 48). For example, when she reaches for a gallon of milk in the fridge, she has to use her left arm for help and hold the milk against her chest because her right arm cannot hold the milk alone (Tr. 49). Her shoulder issues impact her daily life because she cannot lift above her head and also has trouble lifting something off the floor because it is too painful (Tr. 49). She further testified that she cannot pull anything out of the cupboard that is above the second shelf. *Id.* Putting dishes away is also difficult. *Id.*

Plaintiff testified that C-Diff also impacts her. She explained that when she has to go to the bathroom, she struggles to make it there in time (Tr. 50). Additionally, C.Diff causes Plaintiff's immune system to be suppressed, and her doctors have advised her to

not work around the public, like as a cashier, because she will likely get sick (Tr. 50-51).

Plaintiff also sees a counselor for her anxiety, which increased when she had the C.Diff

experience in 2016 (Tr. 51). Plaintiff testified that her anxiety impacts her by making her

afraid to go places. *Id.* Plaintiff testified she also suffers from a seizure disorder, but has

not had a seizure since 2017 since she now takes medicine (Tr. 52). Finally, she suffered a

fall and now has back pain. *Id.* She testified that at the time of the hearing, she had just

completed physical therapy for her back injury, but still has pain. *Id.*

     Plaintiff testified that she cannot perform the duties of cashier at this point because

her anxiety has overtaken her life and her bowels are not under control because of her C.

Diff (Tr. 52-53). She would not be able to make it to the bathroom at work and also could

not leave a customer (Tr. 53). Plaintiff testified that she has bowel movements, on average,

five to seven times a day. *Id.* The pain in her shoulders would also impact her ability to

be a cashier, and Plaintiff testified she cannot lift things, so she would not be able to be a

cashier. *Id.* For example, she could handle small items on the conveyer belt, but if there

are big items, she would not be able to pick them up (Tr. 54). Plaintiff also testified that

she did try to find different types of work, including working at a Senior Center Home,

but she could not continue to do that job after being diagnosed with C.Diff (Tr. 54-55).

Plaintiff explained her C.Diff flares up regularly (Tr. 56-57).

     A VE also testified at the hearing and the VE indicated that his testimony was

consistent with the DOT and based on his experience in job placement (Tr. 62-63). The VE

did not testify to how many jobs are in the national market for each of the jobs outlined

in his testimony.

The ALJ first asked the VE to classify Plaintiff's prior work. The VE explained that a cashier at Dillard's is best described as a cashier II (DOT 211.462-010), light, unskilled work with a Specific Vocational Preparation ("SVP") level of 2.[4] The VE explained that Plaintiff also worked as an inventory clerk (DOT 219.387-030), which is light, skilled work with an SVP of 5. The VE explained that both of these jobs are generally light, but as performed by Plaintiff, are better characterized as a medium exertion level because "I believe she's on her feet the entire time" (Tr. 58). Additionally, the VE testified that Plaintiff worked as a cashier at Home Depot (DOT 211.462-010), which is generally light, unskilled work with an SVP of 2, but as performed, is better classified as a medium exertional level (Tr. 59-60). When she was a supervisor of the cashier team, the VE testified that supervisors (DOT 211.137-010) are classified as light, highly skilled work with an SVP of 7, but, per Plaintiff's description, her lifting and being on her feet means that she performed this at a medium exertional level (Tr. 59).

The ALJ then asked the VE to assess a hypothetical person of advanced age (55) and closely approaching retirement age as of January 10, 2019, with a 12th grade education, and past work history similar to that of Plaintiff's (Tr. 59). Additionally, this

---

[4] Specific vocational preparation, or "SVP", is the amount of time required for a typical claimant to: learn the techniques, acquire the information, and develop the facility needed for average performance in a job. A claimant may acquire SVP in a school, military, institutional, or vocational environment through such settings as: vocational training, apprenticeship training, in plant training, on-the-job training, and essential experience in other jobs. For example, a registered nurse has an SVP of seven, which means that a claimant can learn this job in about 2-4 years. If the job is assessed as an SVP of 1, it means that only a short duration is needed to learn the job. In this case, a 2 means that it would take up to 1 month to learn the job. *See here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed September 28, 2022).

hypothetical person can lift 20 pounds occasionally and 10 pounds frequently; stand and walk a total of about 6 hours with normal breaks; sit a total of about six hours with normal breaks; cannot climb ladders, ropes, or scaffolds; can crawl only occasionally; can reach in all directions frequently and bilaterally; has unlimited balancing, kneeling, crouching, and stooping capabilities; can maneuver ramps and stairs in an unlimited fashion; and cannot be around dangerous, unprotected heights, or dangerous unprotected moving machinery. *Id.*

In response to this hypothetical, the VE testified that this hypothetical individual could do Plaintiff's past work as described by the DOT, but not as Plaintiff performed it. *Id.* So, based on the DOT's descriptions, the VE testified that the hypothetical person could perform Plaintiff's cashier work, supervisor of cashier work, and sales attendant work. *Id.* The ALJ asked the VE if the hypothetical person could do those jobs if the jobs required frequent reaching in other directions (Tr. 60). The VE explained that if the hypothetical person was required to reach frequently in other directions (not just overhead), the jobs would be eliminated because they require frequent lifting. *Id.* The VE testified that there are no acquired work skills that would transfer to other occupations with only occasionally reaching in other directions (and not overhead). *Id.* Ultimately, the VE testified that the hypothetical person could do the composite job at Dillard's and the cashier position at Home Depot, but could not perform as a supervisor based on the DOT descriptions *only* (Tr. 61). The VE pointed out that as Plaintiff described these jobs, the hypothetical person could not perform them (Tr. 61-62).

The ALJ asked the VE about break times for Plaintiff's past positions, and the VE

explained that breaks are usually after two hours of work, one at lunch, and then one more break at the end of the day (Tr. 62). Individual breaks are done on an individual basis and are up to the employer, but "a person is supposed to be on task most of the day" (Tr. 62). The VE testified that a person is not likely to be employed in these jobs, particularly unskilled work, if they require more breaks on a regular basis. *Id.*

Plaintiff's attorney questioned the VE, and asked the VE to revisit the original hypothetical, but add that the person can only extend the dominant upper extremity to reach forward about 2/3 of the way (Tr. 63). The VE testified that the hypothetical person would have to perform the work in "a different way." *Id.* Plaintiff's attorney then asked the following question:

> And this is kind of a weird question, but what would a cashier be doing the remainder of the day if they were only able to reach frequently—if a person's able to reach frequently, my understanding is that means they'd be able to reach up to 2/3 of the day, if they weren't able to reach that remaining 1/3 of the day, what would they be doing in that position?

(Tr. 64).

The VE responded that he did not know, and Plaintiff's attorney would have to consult the DOT and the Department of Labor. *Id.* The VE further explained that he believes the minimum benchmark for cashiers is that they need to reach frequently, but in reality, they need to do other things like putting materials back and stocking, which is not accounted for in the DOT. *Id.* Plaintiff's attorney returned to the original hypothetical and added that this person also has anxiety and must avoid exposure to the general public. The VE testified that this hypothetical person with anxiety would be precluded from the jobs the VE testified were available earlier in his testimony. *Id.*

2.      **Relevant Medical Records**

Plaintiff submitted medical records to aid the ALJ in her determination. The following medical records are focused on Plaintiff's anxiety treatment. These records cover mental health treatment from around January 13, 2016 through May 22, 2018 and then again from August 2, 2018 through January 2020 (Tr 490-516; 903-969)

A treatment note from March 19, 2018 indicates that Plaintiff's current diagnoses are agoraphobia with panic disorder (chronic); major depressive disorder, recurrent, unspecific (chronic); and enterocolitis due to clostridium difficle (acute) (Tr. 491). Also on March 19, 2018, Plaintiff reported "feeling anxious, panicky, having racing thoughts, irritable, anger, mood swings, hyperactive, low mood, lacking pleasure, poor concentration, and memory" (Tr. 496). She reported sleeping throughout the day since her doctor changed her medication (Tr. 496). Additionally, Plaintiff detailed for the provider that she was taking her psychiatric medications (*e.g.,* Lexapro) as prescribed (Tr. 496-498).

During a May 22, 2018 session, Plaintiff was "visibly depressed as evidenced by being tearful" (Tr. 494). A May 7, 2018 treatment note indicates that Plaintiff cannot "leave her home for long periods of time because she needs to be close to a restroom and it causes her anxiety" (Tr. 495). During a January 2016 session, Plaintiff described that her mood was "good" and the Lexapro has helped "immensely" (Tr. 510).

In an August 2, 2018 psychotherapy intake note, Plaintiff indicates that she has struggled with anxiety and depression "most of her life" (Tr. 905). Additionally, Plaintiff "reported she has a hard time leaving her home due to having to be close to a restroom

at all times." *Id.* In these notes, her treating physician also records that Plaintiff's medical trauma from C.Diff increased her anxiety, as she almost died (Tr. 905). In addition to seeking therapy, Plaintiff also sees someone for medication management at "I Think I Can Support Services," as she was currently prescribed psychotropic medication (Tr. 905-906). Plaintiff was given the diagnosis of anxiety at this appointment, but did not meet the criteria for depression disorder at this time, despite her history (Tr. 906). The notes indicate that her providers will continue to assess her for depression. *Id.*

In August 2018, the treatment notes indicate that Plaintiff's goals are to reduce overall frequency, intensity, and duration of the anxiety to a rating of mild or less on the DSM 5 Severity Measure, as well as alleviate anxiety symptoms to a level of mild anxiety or lower (Tr. 908). In September 2018, Plaintiff's treatment notes indicate that Plaintiff is feeling anxious about her disability application, as she cannot work (Tr. 912). Not being able to work makes Plaintiff feel depressed. Additionally, Plaintiff spoke to her provider about her anxiety related to being in public, stating that she cannot leave the house for long periods of time. *Id.*

### 3.    Agency Forms

In a Function Report dated August 20, 2018, Plaintiff described how her anxiety has "taken over her life" and she is afraid to "get[] out" and do things, even grocery shopping (Tr. 173). She explained that he cannot lift anymore because of her shoulder issues. *Id.* Plaintiff is able to take care of her cat and lives with her significant other, who helps her care for the cat by filling and emptying the litter box (Tr. 174). Plaintiff is able to prepare meals and do some household chores, like light leaning and pulling weeds in

the garden (Tr. 175). She cannot mow because it hurts her shoulder (Tr. 176). She sometimes goes shopping, but only in the very early morning and is "in and out" in 10-15 minutes. *Id.* While she will go to her sister's house or the doctor occasionally, Plaintiff explains, "I don't go out most because I am afraid of germ and getting sick" (Tr. 178). Additionally, she details she cannot reach and lift over her head (Tr. 179).

Plaintiff's sister, Melissa Esker, also submitted a Function Report, dated September 4, 2018 (Tr. 189-197). Ms. Esker detailed that her sister stays home a lot and relies on her partner to change the cat's litter box (Tr. 190). While Plaintiff does cook, Ms. Esker explained that her sister cannot lift heavy pots due to her shoulder surgeries (Tr. 191). Prior to getting C.Diff, Ms. Esker explains that her sister would go out to places, but now she stays home for fear of getting sick (Tr. 193). If she were to get sick again, and had to take antibiotics, antibiotics can cause a resurgence of C.Diff (Tr. 195). Ms. Esker also included a narrative letter about her sister's conditions (Tr. 197).

### 4. State Agency Consultants' Opinions

In connection with Plaintiff's application for benefits, the ALJ also considered evidence and opinions from State Agency Consultants.

Harry J. Deppe, Ph.D., completed a psychological examination dated October 23, 2018 at the request of the State agency (Tr. 737-741). In preparation for this examination, Dr. Deppe indicated that he reviewed a patient questionnaire (Tr. 737). In the psychiatric history portion of the form, Dr. Deppe records that Plaintiff has never been treated on an inpatient or outpatient basis by a psychiatrist or psychologist, and is not taking psychotropic medications (Tr. 738). He further mentioned that the examination lasted

approximately 41 minutes, with Dr. Deppe asking Plaintiff questions (Tr. 739-740). For example, Dr. Deppe asked Plaintiff to interpret the proverb to "let sleeping dogs lie," and she responded that it means to "let it alone" (Tr. 739). Additionally, Dr. Deppe asked Plaintiff if she were to find an envelope on the street with a stamp, where should she bring it and Plaintiff answered "to the post office." *Id.* Based on this interview, Dr. Deppe determined that Plaintiff had Adjustment Disorder, with mixed emotional features, in remission as well as a seizure disorder in remission (Tr. 739-740).

Also on October 23, 2018, Dr. Adrian Feinerman, MD, completed a consultative examination at the direction of the State agency. His evaluation was based on notes from "Brian Day" at Washington University in St. Louis regarding Plaintiff's seizures and his own examination of Plaintiff at his office on October 23, 2018 (Tr. 724). Along with detailing Plaintiff's digestive issues, Dr. Feinerman also explained that Plaintiff has had shoulder pain since 2011 when she was diagnosed with a frozen left shoulder. She had surgery on the left shoulder in 2012 and then in 2013, her right rotator cuff was repaired through surgery as well (Tr. 724-725). Plaintiff can walk 50 feet, stand for 5 minutes, sit for 30 minutes, bend, squat, and do "fine and gross manipulation" (Tr. 725). Dr. Feinerman details that Plaintiff has had a history of anxiety since 2009 and is taking a series of medications for her ailments, including Lexapro. *Id.* Dr. Feinerman details that Plaintiff has a "decreased range of motion of the right shoulder" (Tr. 729). The examination lasted a total of 30 minutes (Tr. 730).

M.W. DiFonso, PsyD, and Dr. Charles Kenney, MD, also completed an evaluation (a "Disability Determination Explanation") of Plaintiff at the direction of the State agency

on November 11, 2018 and November 21, 2018, respectively (Tr. 68-82). In preparing this report, they reviewed Dr. Deppe's and Dr. Feinerman's evaluations, as well as medical records, including, but not limited to, records from Plaintiff, Barnes Jewish Hospital, and St. Elizabeth's Hospital (Tr. 69-72). Dr. DiFonso indicates that Plaintiff does not have a history of inpatient psychological treatment and is not taking psychotropic medications (Tr. 73). In the medical summary portion of this report, Dr. DiFonso indicates that he reviewed one of Plaintiff's counseling appointments "at which time she was visibly depressed and tearful," and indicated that she was on Lexapro. *Id.* In this medical summary, Dr. DiFonso also writes Plaintiff "reports that she is unable to leave her home for long periods of time because she needs to be close to a restroom and it causes her anxiety" (Tr. 73).

Dr. DiFonso also documents that Plaintiff has a history of C.Diff and had a stool transplant in 2016. *Id.* This condition is "now in remission" *Id.* He notes that Plaintiff still complaints of abdominal pain, diarrhea, and constipation, as well as shoulder pain in her left shoulder, experiencing a frozen shoulder, and having a right rotator cuff surgery. *Id.* In the "Impairment" section, Dr. DiFonso indicated that Plaintiff has severe epilepsy and severe osteoarthrosis and allied disorders, while she has non-severe depressive, bipolar, and related disorders (Tr. 74). In support, Dr. DiFonso refers to Dr. Deppe's October 2018 evaluation and details that Plaintiff's "reported mental status is well within normal limits" (Tr. 74-75).

Dr. Kenney determined that Plaintiff's symptoms were "partially consistent" with the evidence during his evaluation (Tr. 76). Like Dr. DiFonso, Dr. Kenney relied on prior

reports from Dr. Deppe and Dr. Feinerman (Tr. 76-77).   Dr. Kenney found that Plaintiff has a frozen left shoulder and a right rotator cuff repair, with some limited mobility, but that she can still "reach[] in any direction…frequently" (Tr. 78). Dr. Kenney determined Plaintiff was not disabled because she retained the RFC to complete her prior work as "actually performed" (Tr. 81, 82).

Dr. Lionel Hudspeth, Psy.D., also completed an evaluation dated May 29, 2019 (Tr. 92). Dr. Hudspeth recorded that Plaintiff alleged suffering from anxiety, seizures, shoulder injuries, and C-Difficle infection (Tr. 93). Dr. Hudspeth relied on Dr. Deppe's October 2018 report that Plaintiff's "reported mental status is well within normal limits" (Tr. 93). He reiterated that Plaintiff is not taking psychotropic medications, but it appears Dr. Hudspeth did not have contact with Plaintiff, as the "FO Observations" section states, "No contact" (Tr. 93).

Dr. James Madison completed an evaluation on June 7, 2019 (Tr. 95-100).   He detailed Plaintiff's history with C.Diff, shoulder issues and surgery, and history of seizures (Tr. 98). Dr. Madison agreed that Plaintiff's shoulder issues indicate that her reaching in any direction should be limited to "frequently," while she retains no limitations on handling/fingering or feeling (Tr. 97).

## Analysis

Plaintiff advances two major arguments as to why this case should be remanded. The first is that the ALJ erred in his decision by ignoring medical records that support Plaintiff's contention that she is disabled. In other words, Plaintiff accuses the ALJ of "cherry-picking," *i.e.,* selectively considering the evidence to Plaintiff's detriment. The

second argument is that the ALJ ignored the VE's testimony in determining that Plaintiff can complete her prior work. The Court will address each argument in turn.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). According to Plaintiff, the ALJ ignored extensive mental health medical records and instead, relied upon a consultative psychological evaluation conducted at the request of the State agency to find that her mental health issues were not significant enough to warrant a disability finding. Plaintiff is correct and remand is proper.

In the decision, the ALJ determined that Plaintiff's anxiety could reasonably be expected to cause the alleged symptoms as she described, but that the symptoms were not entirely consistent with the evidence as a whole in the record (Tr. 26). In coming to this decision, the ALJ explained that Plaintiff and her sister, Ms. Esker, submitted function reports detailing that Plaintiff's anxiety regarding germs and her depression related to her being unable to hold a job are "not fully supported by the medical records." *Id.* But the ALJ fails to actually cite to Plaintiff's medical records in the decision; rather, the ALJ relies heavily on the reports of two consultative medical providers' evaluations of Plaintiff, which occurred in October 2018 and November 2018, and were conducted by Dr. Deppe and Dr. M.W. DiFonso, respectively, to describe Plaintiff's mental health issues as non-severe (Tr. 24). These evaluations also do not rely on Plaintiff's medical records, either, so there are gaps in the ALJ's decision that warrant remand.

Dr. Deppe's evaluation is troubling. In preparation for the evaluation, Dr. Deppe indicated that he reviewed a patient questionnaire only (Tr. 737). In the psychiatric history portion of the evaluation, Dr Deppe indicates that Plaintiff has never been treated on an inpatient or outpatient basis by a psychiatrist or psychologist and is not taking psychotropic medications (Tr. 738). Based on this 41-minute evaluation, Dr. Deppe diagnosed Plaintiff with Adjustment Disorder in remission (Tr. 739-740). There is no reasoning in the decision as to why this disorder is in remission, or really any reasoning as to how Plaintiff's issues warrant this specific diagnosis.

Dr. DiFonso's evaluation was no more than a stamp of approval on Dr. Deppe's report. Dr. DiFonso echoed Dr. Deppe, and reiterated that Plaintiff does not have a history of psychological treatment and is not taking psychotropic medications (Tr. 37). But then, in another portion of the evaluation, Dr. DiFonso details that he has reviewed Plaintiff's counseling appointment notes that indicated she was depressed at the time and was on Lexapro (Tr. 73). The ALJ determined that "Dr. Deppe's opinion is persuasive and consistent with his examination as well as the remainder of the record," even though Dr. Deppe did not review any medical records of Plaintiff's prior to the evaluation and included information in his evaluation that was patently incorrect and not supported by the record.

The conclusion that Plaintiff was not on psychotropic medications and had never been in inpatient or outpatient treatment for her mental health was not supported by the record.   In fact, the ALJ had before him records of Plaintiff's bi-weekly therapy sessions and medication management meetings with her mental health providers from

approximately January 13, 2016-January 2020 (Tr. 490-516; 903-969). During this time, Plaintiff was prescribed psychotropic medications, including Lexapro. And this timeline directly overlaps when Plaintiff was examined by Dr. Deppe and he concluded that Plaintiff was not in psychological treatment and was not taking psychotropic medications. Not explaining this discrepancy in the records and then giving significant weight to the opinion of Dr. Deppe shows that the ALJ impermissibly cherry-picked facts in making his disability determination. The ALJ "cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). "If the Commissioner commits an error of law," remand is warranted "without regard to the volume of evidence in support of the factual findings." *White ex rel. Smith v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

Plaintiff's second main argument in support of his contention that remand is proper is based on alleged inconsistencies between the VE's testimony and the ALJ's decision. Plaintiff argues that the ALJ ignored the portion of the VE's testimony in which he testified that a person with Plaintiff's limitations, particularly related to reaching, could not perform the work of a cashier based on the VE's experience. Defendant argues that ultimately, the VE concluded that someone with Plaintiff's limitations could perform both the cashier and cashier supervisor positions as generally performed per the DOT and the ALJ reasonably relied on that testimony (Tr. 30, 58-63).

An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the

evidence and his conclusions."   *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009), internal citations omitted. The VE testified that the hypothetical person detailed to him could do Plaintiff's past work as described by the DOT, but not as Plaintiff performed it (Tr. 59). Furthermore, the VE testified that if the hypothetical person was required to reach frequently in other directions (not just overhead), the jobs would be eliminated (Tr. 60). Ultimately, the VE testified that the hypothetical person could do the composite job at Dillard's and the cashier position at Home Depot, but could not perform as a supervisor *based on the DOT descriptions only* (Tr. 61). The VE pointed out that as Plaintiff described these jobs, the hypothetical person could not perform them (Tr. 61-62).

The Court has already determined that this case will be remanded and, therefore, will not extensively analyze the arguments here. The briefs on this topic both focus on an exchange Plaintiff's counsel had with the VE during the hearing. Specifically, counsel asked the VE what a cashier would be doing the remainder of the day if they were only able to reach 2/3 of the day (Tr. 64). And the VE acknowledged this was a great question, and ultimately conceded that he did not know; this was more of an issue for the DOT and the Department of Labor. *Id.* Additionally, the VE testified that reaching "frequently" is the "minimum benchmark" for a cashier and that in the VE's experience most cashier's "don't stop at frequent" because they will need to do other things like put materials back on shelves and stocking. *Id.*

The ALJ's decision touches on this evidence very briefly. The ALJ noted that "[t]he vocational expert testified that the DOT does not distinguish with respect to reaching" (Tr. 30). But that's the extent of the ALJ's discussion on this evidence. And based on this,

the Court must conclude that the ALJ failed to build and accurate and logical bridge to his conclusion.[5]  Accordingly, remand is proper under this basis as well.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Plaintiff was disabled during the relevant period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

<u>Conclusion</u>

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED: September 30, 2022**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**

---

[5]  The Court also notes that in its review of the record, the Court did not find where the VE testified whether the positions the VE indicated the Plaintiff could perform were positions that exist in significant numbers in the national economy, in accordance with §404.1566.